THORNE (BLACK v.). See Cases Nos. 1,465 and 1,466.

---

## Case No. 13,989.

### THORNE v. WHITE.

[1 Pet. Adm. 168.] [1]

District Court, D. Pennsylvania. 1806.

SEAMEN'S WAGES—FORFEITURES AND DEDUCTIONS —MISCONDUCT — QUARRELS AND AFFRAYS — AUTHORITY OF MASTER—CRUEL PUNISHMENTS—RECEIPTS FOR WAGES.

[1. Criminal offences by mariners do not destroy their contracts. Being amenable to a criminal prosecution, and liable to fine and imprisonment, they should not receive a double punishment by forfeiture of wages.]

[Cited in The Nimrod, Case No. 10,267; The Maria, Id. 9,074; Thomas v. Gray, Id. 13,898; The Antioch, 11 Fed. 168.]

[2. Broils, assaults on, or resistance to, masters, do not ordinarily operate to forfeit wages, nor do they amount to mutiny or revolt, which crimes are defined by statute, and are punishable with death.]

[3. It is the duty of seamen to bear with the ill temper of the master, and get out of his way

[1] [Reported by Richard Peters, Jr., Esq.]

when he is in a passion. The master must not pursue a seaman who flies from him when enraged.]

[Cited in Fuller v. Colby, Case No. 5,149.]

[4. When the crime of a sailor is too great for the master's authority to punish, the master must not take the law into his own hands, but must seize the criminal, put him in irons, and bring him to justice on the return home.]

[Cited in Fuller v. Colby, Case No. 5,149.]

[5. The loss or damage accruing to the owner or master by any negligence or crime may be set off against wages.]

[6. The master should maintain a temperate demeanor and orderly and decent conduct towards the seamen. He may inflict moderate physical correction, out, if he commences a dispute with improper and illegal behavior, he risks the consequences.]

[Cited in Butler v. McLellan, Case No. 2,242; Gardner v. Bibbins, Id. 5,222; Sheridan v. Furbur, Id. 12,761; Fuller v. Colby, Id. 5,149.]

[7. When a seaman is incorrigibly disobedient, and will not submit and offer to do duty and make amends, the master may discharge him, or correct and confine him on board, or dock him of his provisions.]

[Cited in Hutchinson v. Coombs, Case No. 6,955; Smith v. Treat, Id. 13,117; Lamb v. Briard, Id. 8,010; The Cornelia Amsden, Id. 3,234; The Stacey Clarke, 54 Fed. 533.]

[8. If a seaman is prevented by confinement under the master's orders from doing duty, he is excused from it by the master's act; and, on submission, the master must, in ordinary cases, accept his services.]

[Cited in The Nimrod, Case No. 10,267; The Mentor, Id. 9,427; Fuller v. Colby, Id. 5,149.]

[9. Receipts given by seamen in full of all demands are only prima facie evidence, and the facts may be examined into.]

A seaman cited the master, to shew cause why process should not issue against the ship, for wages.[2]

---

[2] At the circuit court of the United States, October, 1806, before Judges Washington and Peters, one Magill, mate of the brig Rover, Budden, master, lying, at the time when the offence was said to have been committed, in the haven of Cape Francois, was indicted for murder, in killing, with malice, &c., his captain. The death ensued a quarrel and affray, originating from intoxication on the part of Budden, and imprudently aggravated by intemperate language and ill-timed resistance on the side of the mate. The fatal stroke was given with a very large club, on board the vessel, but the death took place on shore. The testimony supported only one of the counts in the indictment; and was substantially as before stated. The defence on the merits was suspended, to take the opinion of the court on the point of jurisdiction. It was alleged, and so ruled by the court, that the stroke having been given at sea, or in the haven, and the death occurring on land, within a foreign territory, the crime was not completed within the jurisdiction of the court, which only embraced offences "on the high seas." On two of the counts, a nol. pros. was entered, and a verdict of acquittal taken on the third; though some doubts arose whether, if the court had no jurisdiction, the verdict could legally be recorded. Many authorities from the British books were cited by the prisoner's counsel, to shew, that the place where the stroke was given, and that of the death, must be within the juris-

Cause shewn. That the mariner, who had conducted himself well, in other respects, during the whole voyage had a difference with the captain, in the river Delaware, on the ship's return. A quarrel ensued, and blows passed. The master began the affray, with violence and intemperate passion. He threw scalding water, into the seaman's face—provoked resistance first, and afterwards a return of blows, from the seaman. Both parties conducted themselves improperly. The master confined the mariner in the fore-castle, and threatened his life, if he came on deck. A neglect, and refusal to do duty was alleged, which the mariner denied. No order, or demand to do duty, was proved. The resistance to, and attack on, the captain, and the sailor's leaving the ship, before she was unladen, were also insisted on, to repel the claim to wages.

BY THE COURT (HOPKINSON, District Judge). It is unreasonable to insist on the neglect of duty, when the seaman was prevented by confinement and threats. Passes at him, with a drawn sword were made by the captain, at one time, when he attempted to come on deck. If affrays on board ships, arising from sudden quarrels, are to forfeit wages, forfeitures would be very common indeed. It is a mistake, frequently entertained by owners and masters of ships, that broils, assaults on, or resistance to masters (produced most commonly by faults on both sides) forfeit wages. Such offences are often improperly called mutiny or revolt; but they do not amount to this offence, which is defined by our statute, and declared to be a capital crime, and punishable with death. They may be, when the fact justifies the conclusion, evidence of intent, or overt acts, furnishing ingredients for this crime. But in general, they are merely the intemperate effects of personal animosities, sudden passion, the pride of power, and the sourness of reluctant obedience, or mulish resistance. It is the duty of seamen to bear even the ill-temper of the master, and to get out of his way, when instances of passion occur. Consulato del Mare, 16; Sea Laws, 139, 140. Some of the maritime laws are particular in adjusting how a mariner shall demean himself when the master is enraged, and when he may stand on his defence. A master must not pursue (as was done in the case before me) a mariner, who flies from him when enraged. Many of the sea laws are curiously directory in such points. When a sailor is disobedient or mutinous, the captain is to hold up the ship's towel (according to one of the sea laws), for a certain time, within which the mariner is to submit, under the penalties therein prescribed. The law warrants moderate correction of mariners; but, this

diction; and the offence was not complete unless both circumstances concurred. Unless the stroke and death so concurred, it was not murder "on the high seas." The name of the offence is only mentioned in the act of congress; its definition is left to common law interpretation—and the authorities cited shew the construction. On the part of the United States it was contended; that the authorities cited, only applied to the subject of vicinage, and were directory of the place of trial, as it respects the summoning the jury. The place of trial is here fixed by our law—to wit, the district of first arrival, or apprehension of the party, and therefore the British authorities are irrelevant and useless. That the British admiralty jurisdiction extended to parts beyond the seas, though the jurisdiction not being local, but personal over their subjects, in whatever country they committed offences, cognizance was not taken by their ordinary courts. A court, consisting of the admiral and constable, had cognizance in cases of offences committed by British subjects beyond seas. This court is obsolete by non user; but the jurisdiction remains among the powers of admiralty and maritime cognizance; though it is not exercised in modern times. Its existence is only suspended not destroyed. Civilians (Domat, etc.) have asserted this jurisdiction in other countries.—No case of the actual exercise of this authority was produced. It was further contended, that the constitution having given to congress, and they having assigned, by the 11th section of the judiciary act, the jurisdiction contended for, the court is legally invested therewith. If it be not within admiralty and maritime jurisdiction (in which no distinction appears in the constitution between civil and criminal cases) congress have no power to legislate in the case; and so such heinous offences must go unpunished, when attended with circumstances like those of the present transaction. It was replied by the defendant's counsel (Mr. Ingersol), that the 8th section of the act relating to crimes (and not the 11th section of the judiciary act) is explanatory and decisive, being subsequent to the judiciary act. The only enquiry under this section is—whether murder was committed on the high seas? The stroke and death must be in the same place, to fix a jurisdiction. Although one was on the high seas, both were not, as they should have been to warrant the court in taking jurisdiction, or cognizance in this case; and therefore the cause is coram non judice, &c.

The court agreed in the general result, though Judge Peters gave no opinion as to the general powers included in the words "admiralty and maritime jurisdiction." Judge Washington, declared that no cognizance was given, over offences committed on land in foreign parts, by these words; but both judges agreed that the stroke and death must occur on the "high seas" to warrant the jurisdiction of this court. It was also agreed by the court—that congress might define the offence, and fix the punishment, if either substantial ingredient happened on the "high seas." They might declare it capital, and punishable as murder, if the stroke, with malice and intent to kill, was given on the "high seas," and the death, in consequence, occurred on land. And so vice versâ. The defendant was bound over to answer at the next court, to a charge of assault and battery, &c. Dallas, attorney of the U. S. Ingersol and Jos. Reed, for the defendant. In a former case, one Russel, a ship master, was charged with murder, in killing his cabin boy—the stroke was given at sea, the death ensued on land. The prisoner was discharged—He was bound over on a charge of assault and battery, but the court was divided on the point of jurisdiction, which Judge Peters asserted, and Judge Chase denied. He agreed that congress had the power to give the jurisdiction, but they had not vested it in the court. Some doubts arose as to the merger of the lesser offence, in the greater, but no decision was given; and thus Russel was discharged, and escaped any farther trial or investigation into his conduct. Rawle, attorney for the district. Lewis, for the defendant.

correction, by the law of Oleron (Laws of Oleron, art. 12), is confined to one stroke of the fist. The laws of Wisbuy, among others, are very severe on mariners striking the master; but the cruel punishment therein designated is disused. All these laws regulate the authority of the master; and confine it to moderate correction. When the crime of a sailor is too great for the master's authority to punish (which should be evident on the trial, to justify severe measures) the master and his officers are to seize the criminal, put him in irons, and not take the law into their own hands, but bring him to justice on their return.[3] But the contract for wages is not affected.

Although it is laid down as a general rule, that criminal offences, and especially those of inferior grade, do not affect civil contracts, I would not be understood to say, that this rule cannot have exceptions. There may be cases so atrocious as to render the seaman unworthy of further trust, and operate in violation of his contract. It may be dangerous to retain him in service, or to suffer his being at large in the ship. Such cases must always be determined on the special circumstances attached to them. Loss or damage, accruing to the owner or master by any negligence, or crime, may be set off against wages, as in case of any other demand. I have generally thought myself warranted to give a latitude of construction to the words "moderate correction," where chastisement was salutary and merited, and in this I have never been overnice. The safety of a ship sometimes depends on promptly checking disobedience, and stimulating exertion. Subordination is peculiarly essential to be enforced, among a class of men whose manners and habits partake of the attributes of the element, on which they are employed. I have never bound over a master for correcting a sailor, unless cruelty was exercised, or improper weapons used. Instances have not been rare in this court (and they have not been overlooked) where the most enormously cruel, and unjustifiable acts of tyranny, and wanton abuses of power, have been exhibited by masters of ships.[4]

[3] In a case wherein confinement on board the ship, of two disobedient seamen, appeared to me proper, and indispensable, and where frequent endeavours to reclaim were ineffectually tried, for almost the whole latter section of the return voyage, I held the confinement in irons, so justifiable and necessary for the safety of the ship, that I refused to allow wages for that part of the voyage. The two seamen were influential characters, and atrocious leaders of a rebellious crew. They had not misbehaved on the former part of the voyage. I considered it to be a partial breach of contract, and not a forfeiture in toto. These seamen complained, I thought without cause, of high-handed and cruel treatment. I left them to their remedy at common law, by action for false imprisonment, or any other mode of redress.

[4] This is by no means mentioned as a general censure, but as an inducement to strict examination into cases likely to develope such incidents. An enumeration of them would not only be shocking to humanity, but offensive to common

Seamen too frequently provoke, and receive, proper correction; but masters should set examples of discretion, and regulate their passions. They must stop at the point, beyond which the law forbids them to pass. The sea laws enjoin on the master a temperate demeanor, and orderly and decent conduct, towards seamen. By several of these laws, he is finable for abusive expressions, or misconduct, towards mariners. He risks the consequences, if he commences a dispute with illegal conduct, and improper behavior. It is impossible to fix with certainty, the nice tints and colours, which mark the boundaries, between a justifiable command, and an improper exercise of authority; but these accuracies are seldom required. In the case stated, the circumstances are strongly marked. The laws, though often applied to for this purpose, do not encourage or gratify revenge; they only punish for reformation, or example. When a mariner is incorrigibly disobedient, and will not submit, and offer to do duty and make amends, the master may discharge him. He may correct and confine him on board the ship, or dock him of his provisions. If he refuses, or obstinately neglects, to do duty, for any length of time, he does not perform his contract. Such negligence and disobedience, not temporary and fugacious, but continued, must be set off against his demand, for the period during which they exist. If he is restrained from duty by confinement, he is excused from it by the act of the master; who must, on submission, accept of his services, in most cases.[5] But the true ground of this

[footnote continued from left column] decency. It would include not only melancholy consequences of sudden and unbridled passion, but calm, deliberate, and cruelly protracted torture, not exceeded by many accounts we have of the rack, or the real or fabled torments of the inquisition. Some of the perpetrators of these enormities have escaped by defect of testimony, owing to witnesses being absent, and some by doubts about jurisdiction. I have had only to determine on the facts, as they related to contracts. When suits at common law were recommended, or the parties left to their own course, the poverty of the victims, or the difficulty of retaining transient witnesses to give evidence, has precluded prosecutions, or suits, entirely; or, where instituted, prevented punishments, or recoveries. Aware of these obstacles to retribution, some have accepted trifling compromises, to which their "poverty and not their will consented."

[5] Where seamen have been deemed mutinous or dangerous, and in some instances for affrontive expressions, in others for very trifling offences, masters have thought themselves justified in confining them in prisons, or guardships, at foreign ports, I have not considered this as legally justifiable, though some occasions have appeared to render it unavoidable. Some have alleged that the police of the port required it. In the greater number of instances, I have found these punishments to proceed from arbitrary and tyrannical tempers, and, if not entirely unwarranted by the offence yet not defensible in the extremes to which they were extended. Many seamen have perished by diseases and hardships, to which they were subjected in loathsome prisons or infected ships; more have been rendered wretched, and incapable of further service by chronic diseases, or the consequences of acute disorders. I have had to ad-

case is, that a mariner's contract is not destroyed, by such criminal offences. He is amenable to a criminal prosecution;. and liable to fine and punishment. He must not be twice punished for the same offence; first, by forfeiture of wages—secondly, by the fines and punishments affixed by the sea laws, or the municipal law of our country.

I have, on sundry former occasions, given my opinion upon the points—when a seaman's contract for the voyage expires, and when he may leave the service of the ship.

This is a summary of my decisions, as well in the case stated, as in many others, similar in circumstances.[6]  See the case of Edwards v. The Susan [Case No. 4,209].

---

just numberless altercations in these cases, about physicians' bills, gaol fees, or costs paid to military or police officers. I generally determined according as the original cause, prompting the punishment, justified or not, or palliated the proceeding. I have always held the step to require strong justificatory proof. But I could not conceive myself warranted, while the seaman was undergoing one punishment to inflict another, by allowing deductions from wages, or pay for the hire of another, especially when repentance, or offer to return to duty was in proof. Some instances have occurred to warrant the measure, and bear out the master in refusing the re-acceptance of service, and totally ejecting the offender from the ship. Some years ago it was not infrequent for masters, at foreign ports, to terrify mariners into an abandonment of their contract, by threats to deliver them to officers of belligerent ships; and some native, and other adopted citizens, were so delivered; others were hired in their stead at low wages, or to work their passages. I checked this practice, by decreeing wages for the voyage, the causes for those unjustifiable threats, or dismission from the ship, commonly appearing unlawful and sordid.

[6] I have repeatedly found great difficulties in the way of doing justice to either party, in cases of disobedience or neglect. Sailors have so many peculiar propensities, as well vicious as venial, that it is not easy to arrive, or stop when there, at the true points of either punishment or forgiveness. To punish every fault would be endless; and would, by driving seamen from their own, to seek some other occupation, tend to lay up our ships. I could, therefore, do nothing more satisfactory to myself, than to establish some general principle, and disregard niceties in the application. Without balancing much as to degrees of fault or negligence, I have required proof of special damage, in either case. Where damage, or loss, has been sustained, I have ordered retribution; having regard to the circumstances and ability of this class of men. Where neither loss or damage has been in proof, I have overlooked the offence or neglect, where it did not require exemplary notice and punishment. Officers of ships are authorized to use correction for common faults; and can exercise compulsory means, as stimulants to duty. To fix occasional crimes, or faults, as repellants to claims under contracts, would be tantamount to superceding most agreements by mariners. The old sea laws attempted a reformation by mulcts and punishments for enumerated crimes, offences and neglects. These being obsolete in this part of their arrangement, and in some details cruel and inefficacious, are not now practised upon. There can therefore be no accurately marked line; and loss or damage must form the general rule. Included in this rule, are all deductions for loss of service, by refusal or voluntary and unnecessary neglect of duty; as well as retributions for malfeazance, mis-

Wages ordered to be paid. It appeared that cross prosecutions, for the criminal offences, were commenced before a magistrate. A receipt in full of all debts, dues, and demands was produced. The judge stated, such receipts are frequently taken, where quarrels have arisen at sea, to repel prosecutions. They are only prima facie evidence, and may be examined into—Seamen are denied their wages often, unless they sign such receipts. But this is illegal, and no such terms ought to be insisted on.

---

THORNER (AHL v.).  See Case No. 103.

2. The state court had no jurisdiction in the premises except to the extent of decreeing a forfeiture of the bank charter when its jurisdiction ended.

3. It was the duty of the directors of the bank, upon learning its insolvency, to have taken proceedings to surrender its assets to be administered upon under the United States bankruptcy act.

4. The fact that the bank was extinct, as a corporation, and its assets being administered upon under decree of the state court, and according to state laws, at the time of creditors filing said petition in bankruptcy does not affect the jurisdiction of the United States bankruptcy court, and it will lay hold of the assets of the bank, in whosesoever hands they may be, and distribute

---

feazance, or gross negligence. Casual misconduct may be forgiven, or retributed; but inveterate and incorrigible habits of long continuance and dangerous tendency, either entirely annul, or vacate the contract, during their existence, according to circumstances.

