## Case No. 3,234.

### The CORNELIA AMSDEN.

### [5 Ben. 315.][1]

District Court. N. D. New York. Sept. Term, 1871.

SEAMAN'S WAGES—MATE—DISOBEDIENCE TO UNREASONABLE ORDER—WRONGFUL DISCHARGE.

The mate of a schooner had been on duty while the vessel was in port, from 5 a. m. on Saturday to nearly 2 a. m. on Sunday. Having then got the vessel ready to be towed out of port in the morning, he went to bed. About half past 3 the master called him to turn out, to help take the vessel out of port. The mate refused, and the master himself cast the schooner off from the dock, and a tug towed her out of port, and the vessel sailed, the mate doing duty, without further disobedience, till she arrived in the port for which she was bound, when the master discharged him, offering to pay his wages up to the time of his discharge if he would give a receipt in full. The mate obtained some employment after his discharge, but for short periods and at a less rate of wages, and filed a libel against the vessel to recover wages up to the end of the month during which he was discharged. His disobedience was set up as a defence. *Held*, that the mate

[1] [Reported by Robert D. Benedict, Esq., and here reprinted by permission.]

was disobedient, but his offence was a very slight and venial one, not justifying his discharge, and that he was entitled to some indemnity, to be fixed by the discretion of the court; that he must be allowed full wages up to the end of one half month after his discharge, and wages at one-third of the agreed rate up till the end of the month in which he was discharged, and his expenses of travel from the port where he was discharged to the port where he was shipped.

[Cited in The Superior, 22 Fed. 928.]

HALL, District Judge. This is a suit for seaman's wages. The libellant, Arnold G. Harris, was shipped as first mate, for the season of navigation of 1871, at the wages of $60 per month, on the 3d of April, 1871, at the city of Buffalo, N. Y.; and was discharged by the master of the Amsden on the 9th of May, at Erie, Pennsylvania. This suit was brought to recover the balance alleged to be due him for two months' wages up to the 3d June, 1871; and the libel alleges that the libellant was discharged without just cause.

The answer alleges, "that on or about the 7th day of May, 1871, and while said schooner was in the harbor of Toledo, and was about to leave said port of Toledo for the port of Erie, in the state of Pennsylvania, with a cargo of oats on board, the said libellant, being then on board in the capacity of first mate, then and there refused to perform service as first mate on board of said vessel, and then and there refused to obey the lawful command of the master of said schooner, and was then and there guilty of disobedient, mutinous and improper conduct on board of said schooner; that in consequence of such disobedient, mutinous and improper conduct on the part of said libellant, the master of said vessel was compelled to discharge said libellant from the service of said vessel, and did, for the reason aforesaid, on or about the 9th day of May, 1871, at the next port the said vessel reached after leaving Toledo aforesaid, to wit, at Erie aforesaid, discharge said libellant from the service of the vessel, and at the same time offered to pay him for all services he had, up to the time of such discharge, rendered on board of said vessel; and also offered to pay the fare of said libellant from Erie to Buffalo." It also alleges the libellant's refusal to accept what was so offered. The allegations of the answer are, perhaps, too general, indefinite and uncertain, to entitle the claimant to show the libellant's disobedience and misconduct as a justification for his discharge—Macomber v. Thompson [Case No. 8,919]—but, as no objection to the answer was taken before or at the hearing, the question of the sufficiency of the answer will not be discussed, and the case will be considered upon its merits under the proofs of the respective parties.

The evidence shows that the libellant, a resident of Buffalo, after being thus hired for the season as first mate, faithfully served in that capacity until the 7th of May, 1871; that on Saturday, the 6th of May, while the vessel was lying at anchor in the harbor of Toledo, and about 5 o'clock in the morning, the libellant called the men and turned to and kept the crew at work until about 5 in the evening—the master being absent from the vessel much of the time during the day; that then a tug came alongside with orders from the master to get up anchor and lay the Amsden alongside an elevator; that they got alongside the elevator and made the vessel fast, but the elevator not being ready to receive the vessel's cargo, the work on the vessel was resumed and continued until about 8 o'clock in the evening; that about 8 o'clock the elevator commenced receiving the vessel's cargo of grain, and the libellant, as first mate, then went into the elevator and remained there, tallying the grain, until half past 1 o'clock on Sunday morning, when the last of the cargo was delivered,—the libellant and the crew having been kept on duty until that time; that they then cleared up the decks of the vessel, hoisted in the boat, put the hatches down, and about 2 o'clock at night got the tow-line on board, ready for moving in the morning; that the libellant then told the crew they might turn in, and went to his berth; that the vessel was safely moored and was exposed to no danger where she lay; that the libellant had been asleep but a short time when the master of the tug rapped at the cabin door and woke him up; that he told the master of the tug to go away and not trouble him until daylight; that the master of the tug said the day was breaking then, but went away; that the master of the Amsden soon after, and about 20 minutes to 4 o'clock, got up and told the libellant to call the men; that the libellant replied that he had worked them all night, and could not get up until daylight; that the master of the vessel again told the libellant he wanted him to get up and get the vessel under way, and the libellant again declined; that the master of the vessel soon after cast the lines off the dock, and the tug then straightened up on the tow-line, and started the vessel for Erie, when the libellant came out and resumed his duties, going into the forecastle and turning out such of the men as had not turned out on the call of the master; that he continued to do duty as first mate without any farther difference with the master, or any neglect of duty, until they reached Erie,—which they did about noon on Monday,—and there discharged the cargo, under the libellant's supervision and direction. On Tuesday morning, after the cargo had been discharged, and while they were washing up the deck, the master of the Amsden told the libellant there were no freights for them at Sandusky, and the vessel would probably lay up; that he did not want him any longer because they could not agree, and that he would settle with the libellant there, at Erie; and he then

.discharged him from the vessel. After this discharge the master of the Amsden offered to pay the libellant his wages up to the time of the discharge, if the libellant would sign a receipt in full, written by the master, which the libellant refused to do; and the master then declined to pay him. The libellant left the vessel, stating to the master where he could be found, and his willingness to go on board at any time. The vessel did not lay up, but continued her usual employment; and the libellant did not get other employment as mate, though he made some efforts for that purpose. He, however, got other employment at different times, for very short periods and less pay. The master of the Amsden has since employed a first mate in the place of the libellant, at less than $50 per month. There is some evidence that there was a demand for first mates at Buffalo at prices varying from $40 to $60 per month, and it is believed the libellant might have obtained employment at the former wages.

There can be no doubt that there was a single act of disobedience of orders on the part of the libellant; but there is scarcely any doubt that the requirement of the master which led to such disobedience was unusual and apparently unreasonable, if not unjustifiable and oppressive. There is nothing in the case to show that any extraordinary emergency existed which would fully justify the master of the Amsden in requiring his mate, who had been kept constantly on duty from 5 o'clock on Saturday morning to nearly 2 o'clock on Sunday morning, to turn out at half past 3 o'clock on Sunday morning, and before he had more than an hour and a half of rest, in order to take the vessel out of a port where she was safely moored. At most the offence was a very slight and venial one, —even if it be conceded that the master had a strict right to require his crew to take the vessel from port at that early hour of the Sabbath,—and no other act of disobedience or misconduct being imputed to the libellant, either in the pleadings or by proof, his discharge was clearly unlawful. See 1 Pars. Mar. Law, 461, note 3, and cases cited; Smith v. Treat [Case No. 13,117].

The opinion of the late Judge Ware, in the case last cited, expresses, in the most appropriate and exact terms, the general doctrines of the courts of admiralty bearing upon the question under discussion; and it states very clearly and succinctly the principal reasons which have influenced their judgments. The views expressed in the following extract from his opinion must meet with general concurrence. He says: "Generally speaking, the causes which justify the master in discharging a seaman before the termination of the voyage, and especially in a foreign port, are such as amount to a disqualification, and show him to be unfit for the service he has engaged for, or unfit to be trusted in the vessel. They are: Mutinous and rebellious conduct, persevered in; gross dis-

honesty or embezzlement, or theft, or habitual drunkenness; or where the seaman is habitually a stirrer-up of quarrels, to the destruction of the order of the vessel and the discipline of the crew. 1 Pet. Adm. 168, 175 [Thorne v. White, Case No. 13,989]; 2 Pet. Adm. 268 [Black v. The Louisiana, Case No. 1,461]; Bee, 148, 184 [Drysdale v. The Ranger, Case No. 4,097; Sprague v. Kain, Id. 13,250]; Orne v. Townsend [Id. 10,583]; The Lady Campbell, 2 Hagg. Adm. 5; The Vibilia, Id. 228. Ordinarily the law will not justify the master in dismissing a seaman for a single offence, unless it be of a very high and aggravated character, implying a deep degree of moral turpitude—or a dangerous and ungovernable temper or disposition. It looks on occasional offences and outbreaks of passion, not so frequent as to become habits, with indulgence, and by maritime courts it is administered with lenity and a due regard to the character and habits of the subjects to whom it applies. They are a race of men proverbially enterprising and brave, exposed by the nature of their employment to great personal dangers and hardships, contending with the elements in their most violent and tempestuous agitations, and encountering these dangers and hardships with the most persevering courage. But with all this they are of a temperament hasty and choleric, quick to take offence, and ready on the excitement of the moment to avenge any supposed wrong or indignity. The law looks on the fairer traits of their character with kindness, and as making some compensation for defects and faults which are perhaps not unnaturally, or at least are very frequently, associated with those qualities which render them so valuable to their country in peace as well as in war. And when these show themselves occasionally, and are not habitual, it will not visit them with severity, but imposes its penalties with a sparing hand. From considerations of this kind, the court will seldom punish a single offence with the forfeiture of all the wages antecedently earned. much less will it be held as a justification of a discharge of a seaman from the vessel."

It must, however, be remembered that the language of Judge Ware, just cited, was used in a case where the libellant was a common seaman only, and that courts of admiralty would be less indulgent and much more exacting in the case of the first or second officer of a vessel. His higher position, greater compensation, and imperative duty to abstain from setting a bad example to the crew, as well as his presumed superiority in every quality which enables one to understand and appreciate the necessity of a strict discipline and due subordination and obedience on ship-board, and to be temperate and discreet in language and conduct, under circumstances likely to excite the angry or evil passions of an ordinary seaman, would properly be considered as a just

foundation for exacting a strict performance of duty, and for punishing with due severity, by deduction of wages or otherwise, every act of disobedience or misconduct.

The question in regard to the amount which the libellant is entitled to recover in this case is a more difficult one. It was not insisted that the suit was prematurely brought, and the question is therefore one of amount of wages, compensation, or damages. The libellant has not obtained other employment as a first mate, or as a mariner, and it would seem that if he was a competent first mate, he was not probably bound to seek employment in the capacity of a seaman before the mast—Sheffield v. Page [Case No. 12,743]—in order to reduce his claim to full indemnity for the loss of his stipulated wages.

In all cases of unlawful discharge, the seaman has a right to full indemnity, and, in some instances, the discharged seaman has been allowed wages for the full voyage, though he was discharged long before its close. I am inclined to think that in ordinary cases a full indemnity for his loss (deducting his wages earned in other employment during the period of his engagement) should be held sufficient. And the reasons which have induced courts or admiralty to allow seamen shipped for a voyage to distant foreign ports and back, full wages for the whole voyage when discharged without cause in a foreign port where it would be very difficult for them to secure employment, do not apply with the same force to engagements for the season upon our inland waters, with their numerous ports in easy communication with each other, and at which it is not ordinarily difficult to secure employment. And when, as in this case, the libellant was actually disobedient, and, perhaps, technically in fault,—when he might properly, perhaps successfully, have appealed to the reason and humanity of the master in the first instance, instead of bluntly refusing obedience,—a court proceeding according to the course of the civil law, and therefore entitled to exercise a liberal discretion in fixing the amount of the libellant's recovery, can properly limit itself to what will probably, if not certainly, be a just indemnity to the libellant. Fland. Mar. Law, 377, 378, note 1, and 400; Emerson v. Howland [Case No. 4,441]; 1 Pars. Mar. Law, 462, note 5, and cases cited.

In view of all the circumstances, I shall allow the libellant full wages up to the end of one half month after his discharge, and $3.75 for his fare and expenses in travelling from Erie to Buffalo; and at the rate of $20 per month for the residue of the time up to the 3d of June, the end of the second month of his engagement. Such an allowance as will afford no encouragement to either master or seaman to violate his engagement should be made, and I have endeavored to do so in the present case. And, in cases where it is proper, I shall not hesitate to punish disobedience or misconduct by a deduction from the wages earned, or to discourage and discountenance the bringing of suits on frivolous grounds, by the exercise of a suitable discretion in respect to costs.

There will be a decree for the libellant for $36.75, with costs.